# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TENNESSEE GAS PIPELINE CO. LLC   :
      :
      **Plaintiff**      :
      **v.**           :    **3:13-CV-46**
      :    **(JUDGE MARIANI)**
DELAWARE RIVERKEEPER NETWORK :
et al.,      :
      :
      **Defendants**      :
      :
SECRETARY MICHAEL KRANCER      :
      :
      **Intervenor**      :

## MEMORANDUM OPINION

### 1. Introduction and Procedural History

Plaintiff Tennessee Gas Pipeline Company LLC ("TGPC") filed an Amended

Complaint (Doc. 11) and Amended Motion for Emergency Preliminary Injunction (Doc. 12)

on January 8, 2013 seeking, *inter alia*, a declaratory judgment that the Natural Gas Act

preempted Pennsylvania's Environmental Hearing Board ("EHB") from reviewing permits

that the state's Department of Environmental Protection ("PADEP") had issued to TGPC as

required by the Federal Energy Regulatory Commission's ("FERC") Order dated May 29,

2012. These permits had been appealed to the EHB by Defendants Delaware Riverkeeper

Network, Maya Van Rossum, and Responsible Drilling Alliance (collectively, "DRN").

The Court orally granted Secretary Krancer's Motion to Intervene (Doc. 19) during a

conference call with all parties on January 11, 2013 and later memorialized the Order in a

written Order on January 15, 2013. (Doc. 28). At that same conference call, all parties

agreed there was no need for an evidentiary hearing for the purposes of Plaintiff's motion.

(Tr. of Conf. Call, Doc. 35, at 20:22-21:14). Following briefing by all parties, the Court held

oral argument on Plaintiff's motion on January 18, 2013.[1] Finally, on January 30, 2013, the

Court ordered DRN and PADEP to supplement the record with any written findings that

PADEP may have made, any correspondence issued, and any other relevant documents or

information related to the three permits at issue. (Doc. 42). Both DRN and PADEP duly

complied with the Order. (Docs. 43-46, 48, 50).

The matter is now ripe for disposition.[2] For the reasons that follow, the Court will

grant TGPC's Motion for Preliminary Injunction.

## 2. Statement of Facts[3]

On March 31, 2011, Plaintiff TGPC applied for a Certificate of Public Convenience

and Necessity for TGP's Northeast Upgrade Project ("Project") under the Natural Gas Act

("NGA"), 15 U.S.C. §§ 717-717z and FERC's regulations, 18 C.F.R. Part 157. (Doc. 31,

Ex. A). In November 2011, FERC staff issued an Environmental Assessment ("EA")[4] under

the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-4370f and

---

[1] Because it would also be facing the preemption issue, Defendant EHB chose not to take a position before this Court on the matter. (Doc. 27, at 3-4). Therefore, the EHB also did not participate in oral argument. (Tr. of Prel. Inj. Hearing, Doc. 40, at 56:10-57:8).

[2] In ruling on Plaintiff's motion for preliminary injunction, the Court does not refer to or rely on Plaintiff's letter dated January 24, 2013 (Doc. 38) or the attached brief submitted by DRN to the EHB. Because the Court is not accepting this document which was filed in a separate state administrative proceeding, DRN's pending Motion to Strike (Doc. 39), which has been briefed fully by all parties, will be denied as moot.

[3] The operative facts in this case are not in dispute, so the Court will not engage in an exhaustive recitation of the facts.

[4] In lieu of an Environmental Impact Statement ("EIS").

2

recommended that the "FERC Order contain a finding of no significant impact and include [certain] mitigation measures . . . as conditions of any Certificate the Commission may issue." (Doc. 13, Ex. D, Part 5, at 4-1). The recommendations were contingent on TGPC's compliance with applicable federal, state, and local laws, including the obtainment of certain state permits. (*See* Section 1.9 of EA 1-21; Table 1.9-1, at 1-22).

On May 29, 2012, FERC issued an Order ("FERC Order") to TGPC (138 F.E.R.C. ¶ 61, 161, *submitted as* Doc. 13, Ex. A). FERC issued a Certificate of Public Convenience and Necessity which authorized TGPC to "construct, install, modify, operate, and maintain certain pipeline and compression facilities to be located in Pennsylvania and New Jersey." (*Id.* at ¶ 1). The Order, however, required TGPC to comply "with the environmental mitigation measures set forth in Appendix B," (*id.* at ¶ (E), at 74) which mandated TGPC's compliance with mitigation measures set forth in the EA. (*Id.* at App. B, ¶ 1).

The FERC Order addressed many concerns that commenters had raised. In response to one criticism of the EA, the FERC Order stated:

> The EA does not defer our NEPA responsibilities to other agencies; rather it explains that based on Tennessee's compliance with other laws and mitigation required by the Commission and other agencies, the EA can recommend a finding of no significant impact . . . . The EA acknowledges the reality that Tennessee will be required to comply with other federal and state laws not administered by the Commission and implement additional mitigation measures required by other federal and state agencies.

(FERC Order, ¶ 200). Furthermore, the Order sought to allay concerns that the lack of specificity regarding state permits would allow TGPC to shirk its obligations:

> It is not unreasonable for the EA to assume that Tennessee will comply with permit requirements because other agencies will require Tennessee to do so. Multiple agencies, including New Jersey DEP, Pennsylvania DEP, the Corps, and others must issue separate authorizations for many of the planned construction activities and environmental impacts. As pointed out through the EA and in this order, many of the resource areas addressed in the EA are protected by federal and state laws to which Tennessee is obligated to adhere.

(*Id.* at ¶ 171). The Sierra Club also voiced its belief that TGPC's violation of Pennsylvania's Clean Streams Act, 35 PA. CONS. STAT. § 691.401, was a near certainty based on TGPC's history of alleged non-compliance. However, the Order responded that "Tennessee's compliance with the Pennsylvania Clean Streams Act is the responsibility of the Pennsylvania DEP to which Tennessee will answer if it does not comply." (*Id.* at ¶ 176).

On June 28, 2012, DRN and others filed a Request for Rehearing before the FERC in which DRN requested a stay of the May 29 Order; FERC denied the petition for stay on January 11, 2013. (Doc. 20, Ex. A, ¶ 1). Following FERC's denial, on January 18, 2013, DRN appealed FERC's May 29 Order to the United States Court of Appeals for the District of Columbia pursuant to 15 U.S.C. § 717r(b).[5] (Doc. 37, Ex. A).

Meanwhile, TGPC had obtained three permits from the PADEP on November 21, 2012: one Erosion and Sediment Control General Permit ("ESCGP-1") under 25 PA. CODE CH. 102 and two Water Obstruction & Encroachment Permits under 25 PA. CODE CH. 105.[6]

---

[5] DRN had also filed a Petition for Writ under the All Writs Act in the United States Court of Appeals for the District of Columbia. (*See* Doc. 20, at 2).

[6] Plaintiff characterizes the water permits as being required under the Federal Water Pollution Prevention and Control Act, commonly known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387 (specifically, Section 401 Certifications), in addition to being required under state law. In TGPC's Environmental Report submitted with its application to FERC, TGPC committed to obtaining certain permits in Pennsylvania, including a

FERC issued a Notice to Proceed to TGPC on December 14, 2012. On December 19, 2012 DRN appealed PADEP's issuance of the three TGPC permits to the EHB. After denying the petition for temporary *supersedeas* on December 20, 2012, the EHB scheduled a hearing on DRN's petition for *supersedeas* from January 14-16, 2013. (Doc. 13, Exs. E, F, Doc. 49, Ex. A, at 3). The EHB denied the *supersedeas* on January 17, 2013 and issued its opinion on February 1, 2013. (Doc. 49, Ex. A).

### 3. Standards for Injunctive Relief

This Court must consider four factors when ruling on Plaintiff's motion for preliminary injunction: (1) whether TGPC has shown a reasonable probability of success on the merits; (2) whether TGPC will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the Defendants; and (4) whether granting preliminary relief will be in the public interest. *Am. Exp. Travel Related Serv., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). "The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate." *P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005).

---

"CWA 401 Water Quality Certification," "Chapter 105 Water Obstruction and Encroachment Permits," and "CWA Section 402 NPDES Chapter 102 Erosion and Sediment Control General Permit (ESCGP-1) for Construction Activities" from the PADEP. (Doc. 31, Ex. B, Table 1.6-1 headed "Permits, Licenses, Approvals, and Certificates Required for Construction, Operation, and Maintenance of the Northeast Upgrade Project," at 1-40).

DRN disputes this characterization and insists the water permits were issued pursuant to state law only and not under the delegated authority of the CWA (Doc. 32, at 4) ("In its EHB appeals, DRN challenges TGP's Ch. 102 and 105 permits . . . based solely on violations of Pennsylvania statutes and regulations. DRN's claims do not allege violations of federal law as implemented by a delegated state program."). DRN argues that "[a]lthough Ch. 105 permits also serve as Water Quality Certifications under the state's delegated CWA Section 401 program, 33 U.S.C. § 1341, PADEP issues Ch. 105 permits under the separate state authorities provided by the Clean Streams Law, Flood Plain Management Act, and Dam Safety and Encroachments Act." (*Id.* at 3, n.2; *see also* Doc. 41, Ex. A, 1-2). The Court will address this disputed characterization *infra*.

## 4. Analysis

### 1. Under the Applicable Law, TGPC is Entitled to a Preliminary Injunction

#### i. Reasonable probability of success on the merits

##### a. Preemption

Before reaching the heart of the issue, the Court would first point out that this is not, as Plaintiff contends, a case that turns on preemption. It is true that the cases which Plaintiff cites stand for the proposition that the NGA generally preempts state review of permits issued pursuant to the NGA or FERC orders. *See, e.g., Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 305, 108 S. Ct. 1145, 99 L. Ed. 2d 316 (1988) ("Congress occupied the field of matters relating to wholesale sales and transportation of natural gas in interstate commerce."); *N. Natural Gas Co. v. Iowa Utils. Bd.*, 377 F.3d 817, 823 (8th Cir. 2004) ("[W]e are obliged to hold that the Iowa provisions regulate in an area over which the FERC exercises authority granted by Congress, and that [the state laws and administrative regulations], are preempted."); *Nat'l Fuel Gas Supply Corp. v. Pub. Serv. Comm'n*, 894 F.2d 571, 579 (2d Cir. 1990) ("Because FERC has authority to consider environmental issues, states may not engage in concurrent site-specific environmental review."); *see also Ne. Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 348 (3d Cir. 2001) ("[I]f it is evident that the result of a process must lead to conflict preemption, it would defy logic to hold that the process itself cannot be preempted."); *Rockies Express Pipeline LLC v. Indiana State Natural Res. Comm'n*, No. 1:08-CV-1651, 2010 WL 1881084, at *2 (S.D. Ind.

May 7, 2010). However, none of these cases involved the issuance of a permit pursuant to the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*, which is the case here.[7]

The NGA, under 15 U.S.C. § 717b(d), specifically carves out an exception for the CWA: "[e]xcept as specifically provided in this chapter, nothing in this chapter affects the rights of States under the Federal Water Pollution Control Act [the Clean Water Act] (33 U.S.C. 1251 *et seq.*)." Under Section 401 of the CWA, "[a]ny applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate." 33 U.S.C. § 1341(a)(1).

In fact, *Islander East Pipeline Co., LLC v. Connecticut Dep't of Envtl. Prot.*, states that though "Congress wholly preempted and completely federalized the area of natural gas regulation by enacting the NGA, . . . Congress did not, however, thereby supersede any other federal statutory requirements, such as section 401 of the CWA." 482 F.3d 79, 90 (2d Cir. 2006) ("Islander I") (citing *Schneidewind*, 485 U.S. at 300-01) (other internal citations omitted). "While state and local permits are preempted under the NGA, state authorizations required under federal law are not." *Id.* at 84 (internal citation omitted). "Under the CWA, . . . Congress provides states with the option of being deputized regulators under the authority of federal law." *Id.* at 90. On the appeal from remand, the *Islander East* court specifically

---

[7] In its opinion denying DRN's petition for *supersedeas*, the EHB stated that it disagreed with TGPC "that the Board lacks jurisdiction to hear [the appeal of the permits] as a result of broad federal preemption of state regulatory activities. (Doc. 49, Ex. A, at 26). The Board stated this was a situation where "within an occupied field-[,] federal regulation may tolerate or authorize exercises of state authority." (*Id.* at 27) (quoting *Ne. Hub Partners*, 239 F.3d at 346, n.13).

cited *National Fuel Gas*, and noted that "[w]hile the NGA generally preempts local permit and licensing requirements, the Clean Water . . . Act[] [is] notable in effecting a federal-state partnership to ensure water quality . . . around the country, so that state standards approved by the federal government become the federal standard for that state." *Islander East Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 143 (2d Cir. 2008) ("Islander II"). As such, deciding the preemption issue would not resolve this case. Rather, the case involves the intersection of the NGA and the CWA and harmonizing the application of the two federal statutes to the fullest extent possible.

### b. Permits

Both DRN and PADEP argue that the Water Obstruction and Encroachment Permits were issued pursuant to state law[8] which is "expressly recognized under CWA Section 401, not as a delegated federal program nor as a program solely derived from federal law." (Doc. 41, Ex. A, at 1). Rather, DRN and PADEP assert "CWA Section 401(d) authorizes the states to ensure that federal permits meet state water quality standards and to condition federal permits on the basis of 'any other appropriate requirement of State law' after a site specific environmental review. 33 U.S.C. § 1341(d)." (*Id.*). Thus, according to them, the permits at issue here were not issued under CWA Sections 402 (National pollutant discharge elimination system) or 404 (permits for dredged or fill material) which *are* federally delegated or federally assumed permitting functions.

---

[8] Clean Streams Law, 35 P.S. §§ 691.1 *et seq.*, Dam Safety and Encroachments Act, 32 P.S. §§ 693.1 *et seq.*, and Flood Plain Management Act, 32 P.S. §§ 679.101 *et seq.*

However, the Second Circuit discussed a similar situation in *Islander*, when the plaintiff sought CWA water quality certification by submitting to applicable state water quality standards. *See Islander II*, 525 F.3d at 145 (analyzing "Connecticut's Water Quality Standards Pursuant to the Clean Water Act"). Further, though PADEP contends that they were issued under state substantive law, both water permits state that "[t]he issuance of this permit also constitutes approval of a Water Quality Certification under Section 401 of the Federal Water Pollution Control Act [33 U.S.C. § 1341(a)]." (Permit No. E64-290, Doc. 32, Ex. 3, at 1; Permit No. E52-231, Doc. 32, Ex. 4, at 1). Thus, though the water permits may have been issued using state substantive standards, the permits carry the label of CWA certifications.

Finally, both water permits specifically refer to the ESCGP-1 permit issued in conjunction with the water permits. "Permittee shall implement and monitor an Erosion and Sedimentation Control Plan prepared in accordance with Chapter 102 so as to minimize erosion and prevent excessive sedimentation into the receiving watercourse or body of water." (Permit No. E64-290, Doc. 32, Ex. 3, ¶ 16; Permit No. E52-231, Doc. 32, Ex. 4, ¶ 16). In turn, the ESCGP-1 permit mandates compliance with the Clean Streams Law. (Permit No. ESCGP-02 00 11 801, Doc. 32, Ex. 2, ¶¶ 18, 19).

At oral argument, counsel for DRN opined that PADEP's decision to issue the ESCGP-1 permit would not be appealable to the Circuit Court because it was not a CWA water quality certification, but would be reviewable only by the Pennsylvania

Commonwealth Court under state law upon appeal from the EHB. (Tr. of Prel. Inj. Hearing, Doc. 40, 45:17-25). Counsel for Plaintiff agreed insofar as the permit was issued under state law. According to him, however, that meant that review of the permit by the EHB or any state court was preempted by the NGA. (*Id*. at 76:9-22). Meanwhile, counsel for PADEP argued that it was "beyond dispute" that "the Chapter 102 permit is related to water quality." (*Id*. at 74:1-4). "DEP's view is we issued these permits together for a reason, and they all represent our protection of water quality standards." (*Id*. at 74:6-8). Furthermore, though "Chapter 105 permits do explicitly reference [Section] 401, . . . Chapter 105, at a substantive level, requires applicants to also meet the Erosion and Sedimentation Control requirements of Chapter 102. So they're all tied together in a very steadfast way." (*Id*. at 74:8-12).

The Court concludes that PADEP's interpretation is correct. The three permits are interrelated in such a way that separate reviews by the Commonwealth Court for the ESCGP-1 permit and a federal circuit court on the water quality certifications could lead to conflicting outcomes and would be judicially cumbersome. Therefore, the ESCGP-1 permit is so interrelated with the water quality certifications that any review of it is appropriate only in federal appellate court.[9]

c. Under the plain language and limited legislative history of Section 717r of the NGA, there is no room for EHB to complete review of PADEP's permitting decisions before an appeal is taken to federal court

[9] Even if the ESCGP-1 permit cannot be characterized as a CWA certification, EHB review would be preempted by the NGA either under field preemption or to the extent that it presents a conflict with the CWA certifications required by FERC. *See Ne. Hub Partners*, 239 F.3d at 348.

This case turns on Section 19 of the NGA,[10] which was amended by the Energy Policy Act of 2005 ("EPACT"), Pub. L. 109-58, 119 Stat. 594. Under this provision,

> [t]he United States Court of Appeals for the circuit in which a facility . . . is proposed to be constructed, expanded, or operated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval . . . required under Federal law, . . .

15 U.S.C. § 717r(d)(1).

Section 717r(d)(1) refers to a "State administrative agency," but does not define that term, making it unclear whether the EHB is included in the definition of a "State administrative agency."

Under Pennsylvania law,[11] an "agency" is defined as "[a] government agency," which in turn is defined as "[a]ny Commonwealth agency or any political subdivision or municipal or other local authority, or any officer or agency of any such political subdivision or local authority." 2 PA. CONS. STAT. § 101. A "Commonwealth agency" is "[a]ny executive agency[12] or independent agency." *Id.* The phrase "independent agency" includes "*[b]oards, commissions, authorities and other agencies and officers of the Commonwealth government*

---

[10] As such, DRN's and PADEP's emphasis on the "cooperative federalism" framework established by the CWA is inapplicable to an interpretation of the NGA, which has traditionally been interpreted to preempt many state regulations and functions.

[11] Though the Court's view is that it is proper to look to a state's laws to see how it defines an agency, the Court notes that the Administrative Procedure Act 5 U.S.C. § 500 *et seq.* offers little guidance in defining "agency" for the purposes of this case. *See* 5 U.S.C. § 551(1).

[12] An "executive agency" includes "[t]he Governor and the departments, boards, commissions, authorities and other officers and agencies of the Commonwealth government, but the term does not include any court or other officer or agency of the unified judicial system, the General Assembly and its officers and agencies, or any independent agency." *Id.*

which are not subject to the policy supervision and control of the Governor," but it excludes "any court or other officer or agency of the unified judicial system or the General Assembly and its officers and agencies." *Id*. Finally, an "administrative proceeding" includes "[a]ny proceeding other than a judicial proceeding, *the outcome of which is required to be based on a record*[13] or documentation prescribed by law or in which law or regulation is particularized in application to individuals. *The term includes an appeal*." *Id*. (emphases added).

"An agency may establish binding policy through rulemaking procedures by which it promulgates substantive rules, or through adjudications which constitute binding precedents." *Pennsylvania Human Relations Comm'n v. Norristown Area Sch. Dist.*, 374 A.2d 671, 679 (Pa. 1977). The EHB's decision "is an adjudication [as opposed to a regulation], and constitutes precedent as binding as any other, in that, in a situation which presents the same facts, and applies the same law, it will control the result, until such time as a party argues successfully that it was inaccurate or incorrect." *Einsig v. Pennsylvania Mines Corp.*, 452 A.2d 558, 568-69 (Pa. Commw. Ct. 1982).

> The Board simply could not wait for the passage of regulations in this instance. It was called upon to construe statutory language in a matter requiring prompt action. No regulations have been promulgated under the Act, and no Pennsylvania case law exists which would aid the Board in its analysis. It was incumbent upon the Board to set some standard, to create some framework, within which it could make a decision. Having decided what it believed the statutory language meant, the Board logically set forth the

---

[13] As noted below (page 21), PADEP is exempt from the requirements to produce a record in support of its decisions.

method by which PMC could prove its case, and what Einsig could do to rebut it. That is the essence of its adjudicatory function.

*Einsig*, 452 A.2d at 569. An "adjudication" is defined as "[a]ny final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made." 2 PA. CONS. STAT. §101. The EHB's decisions are considered adjudications. 2 PA. CONS. STAT. § 704;[14] *see also Tire Jockey Serv., Inc. v. Dep't of Envtl. Prot.*, 915 A.2d 1165, 1185 (Pa. 2007) (describing "[t]he administrative structure that governs environmental regulation in Pennsylvania" as consisting of "three independent, yet inter-related branches:" the Environmental Quality Board, which functions as the "administrative legislative branch," the Department of Environmental Protection, which functions as the "executive branch," and the Environmental Hearing Board, which functions as the "administrative judicial branch.").

Because in *Tire Jockey,* the Pennsylvania Supreme Court characterized the EQB, DEP, and EHB as being part and parcel of the governing environmental administrative structure, a sound, state-law-based argument can be made that there is no compelling reason to limit the definition of "state administrative agency" in Section 717r(d)(1) to the PADEP only, especially in the absence of any contrary Pennsylvania authority. Plaintiff points to the Environmental Hearing Board Act, 35 P.S. § 7513(a), which says "[t]he Environmental Hearing Board is established as an independent quasi-judicial agency." This

---

[14] A reviewing court shall affirm a decision of the EHB "unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, . . ." *Id.*

13

statement does nothing to contradict the state Supreme Court's characterization of the Board above, and it also defines the EHB as an agency.

Despite all of the above arguments in support of interpreting "state administrative agency" as encompassing the EHB, the phrase "state administrative agency" does not exist in a vacuum. Section 717r(d)(1) speaks of a "state administrative agency acting *pursuant to federal law*," and as such, the Court interprets the plain language of the statute to mean that any action of a state administrative agency acting pursuant to federal law to issue, condition, or deny any permit required under federal law, refers to the PADEP and PADEP only. PADEP is the state administrative agency that is charged by the Clean Water Act to issue, condition, or deny water quality certifications, not the EHB. *See* 33 U.S.C. § 1341. Rather, the EHB's authority and jurisdiction exist pursuant to state law only. *See* 35 P.S. § 7514(c).[15]

Intervenor argues that this Court should impose an exhaustion requirement on Plaintiff because many of the policy reasons for requiring exhaustion apply here. "Exhaustion concerns apply with particular force when the action under review involves exercise of the agency's discretionary power or when the agency proceedings in question allow the agency to apply its special expertise." *See McCarthy v. Madigan*, 503 U.S. 140, 145, 112 S. Ct. 1081, 117 L. Ed. 2d 291 (1992) (holding that federal prisoners need not

---

[15] The FERC Order also states that should TGPC fail to comply with state law, it will "answer" to PADEP. (FERC Order ¶ 176). While this lends further support that FERC, acting pursuant to its authority under the NGA, interpreted the NGA to mean PADEP was the last stop in the state administrative process, it is of limited value because there is no evidence that FERC was aware of EHB's role in Pennsylvania's environmental administrative structure or that EHB played any part in the comment process before FERC.

exhaust their administrative remedies before filing suit in federal court), *superseded by statute*, Prison Litigation Reform Act, Pub. L. 104-134, 110 Stat. 1321 (instituting requirement of exhaustion of administrative remedies), *as recognized in Woodford v. Ngo*, 548 U.S. 81, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006). "The exhaustion doctrine also acknowledges the commonsense notion of dispute resolution that an agency ought to have an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *Id*. Exhaustion also

> promotes judicial efficiency in at least two ways. When an agency has the opportunity to correct its own errors, a judicial controversy may well be mooted, or at least piecemeal appeals may be avoided. And even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration, especially in a complex or technical factual context.

*Id*. at 145-46 (internal citations omitted). In addition, in its opinion denying DRN's petition for *supersedeas*, the EHB noted that under state law, the permit was not final and that "an appeal to the Board protects important constitutional due process right [*sic*] of appellants." (Doc. 49, Ex. A, at 27) (citing *Morcoal Co. v. Dep't of Envtl. Res.*, 459 A.2d 1303 (Pa. Commw. Ct. 1983)).

> The Board does not believe that federal preemption allows federal agencies such as FERC to highjack state permitting procedures or to rewrite state laws as Tennessee Gas has suggested. To separate the Department's permitting decision from the Board's appeals procedures violates the longstanding state statutory requirements, ignores longstanding due process safeguards and allows the Department to act in a manner that is beyond review under state law. If FERC directed Tennessee Gas to secure permits from the Department that FERC direction included the necessary state procedures established under state law that involve the Board.

(*Id.* at 28).

Nevertheless, Section 717r(d)(1) provides for federal judicial review of "an order or action" by a state administrative agency. It does not mandate that judicial review wait until a *final* agency decision has been rendered, as DRN and PADEP contend. If Congress had intended to require final agency action, it could easily have said so. *See, e.g.,* Administrative Procedure Act, 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.").

Where a federal statute provides for an unqualified right of review, it is impermissible to imply either an additional administrative requirement originating in state law (i.e. a finality requirement) or to recognize an exhaustion requirement by implication. *See W. Radio Serv. Co. v. Qwest Corp.*, 530 F.3d 1186, 1195, n.6 (9th Cir. 2008) (citing *AT&T Commc'n Sys. v. Pac. Bell*, 203 F.3d 1183, 1184 (9th Cir. 2000) (holding that "exhaustion is not required, because the structure of the federal statute shows that Congress did not intend to incorporate varying state exhaustion requirements into federal law as a prerequisite to federal [district] court review.")[16]). Therefore, despite DRN's and PADEP's arguments that

---

[16] The Ninth Circuit went on to say that "unmet state exhaustion requirements bar federal court review only if Congress intended them to bar review." *Id.* at 1185.

PADEP's decisions to issue the permits were not final under state law,[17] Section 717r(d)(1) does not appear to contemplate or require finality of state action.

Thus, a fair reading of Section 717r(d)(1) tips the scales in favor of an interpretation that it is in fact PADEP's initial "order or action" that triggers judicial review. While EHB may very well be authorized to issue, condition, or deny a permit under state law, the language of Section 717r(d)(1) suggests its focus is on PADEP's initial determination as to whether a permit should be issued or denied.

Finally, the extremely limited legislative history of Section 717r also supports finding that Congress intended to cut out all review after the original agency made its permitting decision:

> The limited legislative history accompanying the EPACT indicates that Congress enacted section 19(d) because applicants, like Islander East, were encountering difficulty proceeding with natural gas projects that depended on obtaining state agency permits. See Reg'l Energy Reliability & Sec.: DOE Auth. to Energize the Cross Sound Cable: Hearing Before the H. Subcomm. on Energy & Air Quality, 108th Cong. 8 (2004) (statement of Rep. Barton) (discussing an earlier version of the EPACT, and explaining that "the comprehensive energy bill requires States to make a decision one way or another, and removes the appeal of that decision to Federal court," which "will help get projects, like the Islander East natural gas pipeline, constructed"); Natural Gas Symposium: Symposium Before the S. Comm. on Energy & Natural Res., 109th Cong. 41 (2005) (statement of Mark Robinson, Director, Office of Energy Projects, FERC) (observing that, prior to the enactment of the EPACT, NGA applicants were subject to "a series of sequential *administrative . . . appeals* that [could] kill a project with a death by a

---

[17] 35 P.S. § 7514(c) says, "No action of the Department adversely affecting a person shall be final as to that person until the person has had an opportunity to appeal the action of the Board." (*See also* Tr. of Prel. Inj. Hearing, Doc. 40, at 39:4-10; 58:12-15.). Counsel for Plaintiff argued that Plaintiff is not a person who was adversely affected by the issuance of the permits, so the permits *are* final. Because the *supersedeas* was denied, TGPC "can start construction." (*Id.* at 26:13-23).

thousand cuts just in terms of the time frames associated with going through
all those appeal processes").

*Islander I*, 482 F.3d at 85 (emphasis added).

These considerations especially are compelling because EHB's reviews of PADEP's

permitting decisions are on a *de novo* basis. "Where a DEP decision is appealed to the

EHB, the EHB is required to conduct a hearing *de novo* to determine whether the evidence

taken by the EHB can sustain the DEP's decision." *Groce v. Dep't of Envtl. Prot.*, 921 A.2d

567, 582 (Pa. Commw. Ct. 2007). "The EHB is not an appellate body with a limited scope

of review attempting to determine if DEP's action can be supported by the evidence

received at DEP's fact-finding hearing. Rather, the EHB's duty is to determine if DEP's

action can be sustained or supported by the evidence *taken by the EHB*." *Pennsylvania*

*Trout v. Dep't of Envtl. Prot.*, 863 A.2d 93, 106 (Pa. Commw. Ct. 2004) (affirming EHB's

upholding of PADEP's issuance of a Chapter 105 water encroachment permit upon several

environmental groups' appeal) (emphasis added).[18]

    d.  The few cases to have addressed this issue militate in favor of TGPC

At oral argument, the parties agreed, or at the very least did not dispute, that this

Court would be writing on a clean slate. (Tr. of Prel. Inj. Hearing, Doc. 40, at 28:6-12; 44:5-

---

[18] However,

> a party appealing an action of DEP shall have the burden of proof when a party who is not the
> recipient of an action by DEP protests the action. 25 PA. CODE § 1021.122(c)(2). Thus, a party
> protesting DEP's issuance of a permit has the burden to show, on the record produced before the
> EHB, issuance of the permit was arbitrary or was an abuse of discretion.

*Id.* at 105 (internal quotation and punctuation marks omitted).

9; 67:24-68:1). The seminal cases that have discussed the application of Section 717r(d)(1) are the *Islander* cases[19] and *AES Sparrows*,[20] all of which involved appeals of denials of water quality certifications under the CWA.

Upon a first reading of both *Islander* cases, it is unclear whether the state agency which denied the water quality certification to Islander East was the equivalent of PADEP or the EHB. However, upon reading the briefs submitted in those cases, it is apparent that the plaintiff never appealed the denial of the certifications to the applicable state hearing board. On Islander East's appeal to the Second Circuit, Respondent CTDEP argued in its Supplemental Brief that CTDEP's § 401 certification decision was not a "final decision" from which federal appellate judicial review was available. *Islander I*, Supplemental Brief for Respondent with Attached Appendix, No. 05-4139-AG, 2006 WL 6171582, at *10 (Feb. 14, 2006) (citing *Summit Hydropower P'ship v. Dep't of Envtl. Prot.*, 629 A.2d 367 (Conn. 1993). Instead, under state law, Islander East was required to petition the agency for a hearing for a declaratory ruling. CONN. GEN. STAT. §§ 4-166(3), 4-176, 4-180. However, as the *Islander I* Court noted, CTDEP waived this argument at oral argument, and the Court proceeded as if there were no exhaustion requirement.[21] *Islander I*, 482 F.3d at 88, n.7.

---

[19] *Islander East Pipeline Co., LLC v. Connecticut Dep't Envtl. Prot.*, 482 F.3d 79 (2d Cir. 2006), *appeal from remand, Islander East Pipeline Co., LLC v. McCarthy*, 525 F.3d 141 (2d Cir. 2008).

[20] *AES Sparrows Point LNG v. Wilson*, 589 F.3d 721 (4th Cir. 2009).

[21] Specifically, the Second Circuit noted:

In the CTDEP's supplemental submission to the Court, it argued that Islander East's suit is barred because it failed to exhaust all available state administrative remedies. Section 19(d) of the EPACT does not expressly require that state administrative remedies be exhausted before the commencement of an action under its terms, but Respondent argued that an exhaustion requirement should be implied. At oral argument, however, counsel for Respondent stated that the

In both the *Islander* cases, after the Second Circuit found that the CTDEP had waived any arguments regarding the exhaustion of administrative remedies, the Court proceeded as if there were no hurdles in appealing directly from the determination of a state administrative body, such as the PADEP. "[EPACT], in part amended section 19 of the NGA to provide an expedited direct cause of action in the federal appellate courts to challenge a state administrative agency's order, action, or failure to act with respect to a permit application." *Islander I*, 482 F.3d at 83. Implicit within both of its opinions is the Court's determination that it is not necessary for a state administrative quasi-judicial body to first review the propriety of the issuance or denial of permits by a state administrative agency before judicial review of that agency's decision may be sought.

In *AES Sparrows*, the Maryland Department of the Environment ("MDE") had also denied a water certification to the plaintiff. 589 F.3d at 726. In its denial letter, it specifically informed the plaintiff that it could appeal to the Fourth Circuit. *Id.* at 727. However, after the plaintiff appealed to the Fourth Circuit, the MDE argued that it had not waived sovereign immunity, and thus, the plaintiff was required to abide by state law and pursue any and all appeals pursuant to state law. Under Maryland law, an aggrieved party's "request for judicial review of the Secretary's action on any application shall be made within 30 days after the decision has been rendered." Coastal Facilities Review Act, MD. CODE, ENV. § 14-

---

CTDEP would not press its exhaustion argument, as that argument was neither essential nor important to the case. Accordingly, we deem the exhaustion argument waived.

509(a). The Fourth Circuit rejected the sovereign immunity argument and found that MDE had waived it. *AES Sparrows*, 589 F.3d at 727.

As such, there is more support for Plaintiff's position from these Second and Fourth Circuit cases than there is for DRN's.

e. It is clear that a record exists to present to a Circuit Court

At oral argument, both counsel for DRN and counsel for Intervenor asserted that the record would be insufficient for a Circuit Court to review PADEP's decisions because: (1) the record, which was now "closed," contained only what FERC had before it when it issued its May 29, 2012 Order, and (2) PADEP never developed a record ("Right now, none exists. One would have to be created). (Tr. of Prel. Inj. Hearing, Doc. 40, at 31:17-23, 33:12-24; 65:12-16).

Intervenor further argues that "PADEP does not generally have internal hearing examiners, prepare formal written findings, a formal administrative record or issue adjudications as part of its permit application review process." (Doc. 44, ¶ 2(a)). Rather, PADEP is exempt from these record-keeping or record-developing requirements, and EHB is charged with those tasks. (*Id.*) (citing 35 P.S. § 7514(a)-(c), 2 PA. CONS. STAT. Ch. 5, Subchapter A, and the regulations thereunder at 1 Pa. Code Chapters 31 – 35, 1021). Yet, when this Court ordered either DRN or PADEP to supplement the record with any documents containing written findings issued by PADEP in connection with the three permits, any correspondence to interested parties pertaining to the permits, and any and all

other documents or information related to the permits, both DRN and PADEP submitted hundreds of pages of documents, including PADEP's "Environmental Reviews" for all three permits, Engineers Summary Report for one of the water permits, a Record of Decision for the ESCGP-1 Application, and numerous deficiency letters issued to TGPC. (Doc. 43, Exs. 1, 2; Doc. 44, Exs. A, B). These deficiency letters specifically ordered TGPC to respond to certain technical comments raised during the comment period. Thus, it is clear that though the "record developed" by PADEP is not a formal record in the traditional sense, it is a record nonetheless, and one on which a reviewing federal appellate court can determine whether PADEP acted in an arbitrary and capricious manner in issuing the permits.

Furthermore, FERC, as "lead agency" under the NGA, "shall, with the cooperation of Federal and State administrative agencies and officials, maintain a complete consolidated record of all decisions made or actions taken by the . . . State administrative agency . . . acting under delegated Federal authority) with respect to any Federal authorization." 15 U.S.C. §§ 717n(b), (d). This consolidated record "shall be the record for judicial review under section 717r(d) of this title of decisions made or actions taken of Federal and State administrative agencies and officials, . . ." *Id.* at § 717n(d)(2). "For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates." *Id.* at § 717r(d)(4). Thus, the consolidated record should contain the decisions made and actions taken by PADEP with respect to the three permits, including the Environmental Reviews (see above) and other

documents PADEP produced to this Court. Whether the reviewing Circuit Court will find the documentation sufficient to review whether PADEP's decisions were arbitrary or capricious has been removed from this Court's consideration as the NGA expressly has provided a mechanism by which a Circuit Court can obtain "further development of the consolidated record." *Id.* at § 717n(d)(2).

Moreover, in both *Islander* and *AES Sparrows*, the Circuit Courts were able to review the consolidated record under 717r(d), which included the decisions made by the respective state administrative agencies (counterparts to PADEP). Unlike this case, at issue in those cases were the denials of permits by the relevant state administrative agencies. Both the Second and Fourth Circuits discussed various documents presented to and issued by the respective DEPs in their cases. On both occasions, the *Islander* court was able to glean from the consolidated record what actions CTDEP had taken or omitted. *Islander I*, 482 F.3d at 87-88, 95-105 (citing the CTDEP denial letter, the Final EIS, and various reports which contradicted CTDEP's findings); *Islander II*, 525 F.3d at 151-164. The *AES Sparrows* court recounted in detail each step in MDE's review process of the plaintiff's applications for water quality certifications. 589 F.3d at 725-726. It is clear that both Circuit Courts had no difficulty determining from the consolidated record whether the respective departments of environmental protection had adequate bases for deciding to deny the water quality certifications.

Counsel for PADEP made a persuasive point during oral argument. "[A]llowing the EHB to create an administrative record actually furthers the goals encapsulated in 717r by allowing effective state court review, without setting up a scenario where, okay, we go to the Third Circuit and they find, I don't quite have the right record for this, I'm remanding to get the right record, and then go on. That delay doesn't help anyone, either." (Tr. of Prel. Inj. Hearing, Doc. 40, at 68:14-20). However, because PADEP is exempt from the requirement to develop a record under Pennsylvania law, there is substantial risk that there may be a repeat of the *Islander* cases. In those cases, CTDEP's initial denial of a water quality certification occurred in February 2004. Until the Second Circuit found in May 2008 that CTDEP had not acted in an arbitrary and capricious manner, the question of whether the plaintiff was entitled to a water quality certification remained unanswered. This hardly seems like an expeditious process when EHB review (which admittedly would take several months, even on an expedited schedule) would greatly reduce the likelihood that a federal appellate court would find the record insufficient. Nonetheless, this is the framework that Congress has implemented, and the Court will not second-guess the wisdom of that framework when Congress has provided explicit mechanisms for supplementing an incomplete consolidated record.

Thus, the Court concludes that Plaintiff has demonstrated a reasonable probability of success on the merits, warranting the grant of a preliminary injunction.

## ii. Irreparable harm

Plaintiff asserts that construction delays in building the pipeline can constitute irreparable harm and that because of the likely unenforceability of any money judgments it might obtain against DRN, it has shown irreparable harm. *See, e.g., Gerardi v. Pelullo*, 16 F.3d 1363, 1373-74 (3d Cir. 1994); *Steckman Ridge GP, LLC v. An Exclusive Natural Gas Storage Easement Beneath 11.078 Acres*, Civ. A. Nos. 08-168, 08-169, 08-177, 08-179, 08-180, 2008 WL 4346405 (W.D. Pa. Sept. 19, 2008). The Court agrees insofar as delays and the likely inability to collect on a money judgment constitute irreparable harm.[22]

Lastly, because the Court concludes that the EHB does not have jurisdiction to hear appeals of the permits at issue, Plaintiff would suffer irreparable injury by being subjected to a protracted process before a body lacking in jurisdiction, and the costs associated with the *de novo* nature of the proceedings, both now and each time it receives a CWA certification which DRN feels is unwarranted. Therefore, the Court finds that Plaintiff has met this element.

## iii. Balance of equities

The balance of the equities favors TGPC because of the immediacy and urgency of FERC's timetable (in-service deadline of November 1, 2013) versus the speculative nature

---

[22] Though Plaintiff argues that "any delay, no matter how brief, may have a cascading effect of dramatically delaying Project completion," (Doc. 13, at 7), Defendants' activities have not yet halted Plaintiff's progress on the Project. Multiple times during oral argument, counsel for Plaintiff informed the Court that tree-felling would proceed as planned on Monday, January 21, 2013. (Tr. of Prel. Inj. Hearing, Doc. 40, at 13:21-24; 25:22-25). If, however, this Court were to deny Plaintiff's motion for preliminary injunctive relief, the appeals which DRN has already taken to the EHB would unavoidably present the kind of delay that threatens the timely completion of the Project for which, as noted above, there is no adequate remedy at law.

of DRN's alleged harms. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987). Congress's intent in passing the NGA was to bypass the exhaustive rounds of administrative, state, and federal appeals and to provide for a mechanism whereby an aggrieved party could appeal directly to a federal circuit court. This policy is especially forceful in a case such as this when the EHB reviews PADEP's decisions *de novo*. It is not a matter of reviewing the sufficiency of the evidence considered by and analyzed by PADEP, but rather, an entirely new process in which hearings are held, testimony is received, experts reports are submitted, etc.

Weighed against the certainty of the harms that TGPC would experience if the Project were delayed, DRN's harms are speculative considering that both FERC[23] and PADEP[24] have determined any environmental harms are temporary in light of the mandated mitigation measures imposed on Plaintiff. Moreover, DRN is not left without a remedy as it may raise all of its concerns to a Circuit Court.

### iv. Public interest

Allowing this Project to move forward in a timely manner would also favor the public interest because the Project will add jobs to the local economies, increase revenues for New Jersey and Pennsylvania by hundreds of millions of dollars, and also provide natural gas to residents of New Jersey and Pennsylvania during peak winter months. (Heckman Aff., Doc. 13, Ex. C, ¶¶ 7, 11).

---

[23] (*See* EA, at 4-1; FERC Order ¶¶ 39-201).
[24] (*See* Water Obstruction and Encroachment Permits, Doc. 32, Exs. 3, 4).

## 5. **Conclusion**

For the foregoing reasons, the Court will grant Plaintiff's Amended Motion for

Preliminary Injunction (Doc. 12).  A separate Order follows.

Robert D. Mariani
United States District Judge